# In the United States Court of Federal Claims

BID PROTEST

No. 19-1064C

(Filed Under Seal: October 25, 2019 | Reissued: November 12, 2019)*

|  |  |  |
|---|---|---|
| HARMONIA HOLDINGS GROUP, LLC, | ) | Keywords: Bid Protest; Federal Supply |
|  | ) | Schedule; Market Research; Follow-on |
| Plaintiff, | ) | Contract; FAR Part 10; FAR 8.405- |
|  | ) | 6(a)(1)(i)(C). |
| v. | ) |  |
|  | ) |  |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Defendant, | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| THE MIL CORPORATION, | ) |  |
|  | ) |  |
| Defendant-Intervenor. | ) |  |

*W. Brad English*, *J. Dale Gipson*, *Emily J. Chancey*, and *Michael W. Rich*, Maynard, Cooper & Gale, P.C., Huntsville, AL, for Plaintiff.

*Andrew Hunter*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General. *Jonathan S. Baker*, Attorney Advisor, Contract Law Division, Office of General Counsel, Department of Commerce, Washington, DC, Of Counsel.

*Paul F. Khoury*, Wiley Rein L.L.P., Washington, DC, for Defendant-Intervenor. *Samantha S. Lee*, Wiley Rein L.L.P., Washington, DC, Of Counsel.

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. In a joint response, the parties notified the Court that they had no proposed redactions and the opinion could be released in full.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff Harmonia Holdings Group, LLC, ("Harmonia") protests the decision of the International Trade Administration ("ITA" or "the agency") to award a sole-source contract to intervenor, the MIL Corporation ("MIL Corp"), pursuant to Federal Acquisition Regulation ("FAR") 8.405-6(a)(1)(i)(C). MIL Corp had been engaged in the modernization of the agency's outdated IT applications pursuant to a Federal Supply Schedule task order. At the expiration of the order's five-year term, additional work was needed to complete the project. The agency determined that the most efficient and economical course was to award MIL Corp a contract to perform that work on a sole-source basis as a logical follow-on to the original contract.

Harmonia, a potential competitor for the work, protests the agency's decision, arguing that it was arbitrary, capricious, and contrary to law. The court concludes that ITA acted rationally and in accordance with law in issuing the sole-source, logical follow-on contract to MIL Corp. Accordingly, Harmonia's motion for judgment on the administrative record is **DENIED** and the government's and the intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

## BACKGROUND

### I.    The 2014 Contract

ITA is a component of the Department of Commerce and has "a globally dispersed workforce serving both U.S. companies at home and foreign interests overseas." Admin. R. ("AR") Tab 1 at 1. In 2014, ITA began modernizing and replacing its outdated software applications with "modern, scalable solutions." Id. at 1–2. In the face of an outdated IT infrastructure, ITA sought a contractor to develop "technology strategies and scalable platform solutions that keep pace with industry innovations, avoid obsolescence, and allow for faster, agile delivery of products and services that meet/exceed disparate expectations of ITA's staff and clientele." Id. at 1. Pursuant to a competition among Federal Supply Schedule holders, the ITA awarded a five-year, Time and Materials contract for applications development services to MIL Corp in March of 2014. AR Tab 3 at 7; AR Tab 11 at 109–10. MIL Corp was tasked with modernizing the agency's IT systems, including transitioning legacy applications to the Amazon Web Services Cloud, and updating "extremely complex and heavily customized applications that are totally unique to ITA." AR Tab 13 at 210; AR Tab 3 at 16.

Throughout the term of this contract, MIL Corp "timely performed . . . [with] no delays in performance." AR Tab 1 at 1. Nonetheless, by the end of October 2018, more than "30 critical applications [remained] under development or pending development to modern technologies." AR Tab 13 at 212. ITA's strategic plan, revised in 2018, included an "extremely aggressive migration process" for these applications to promote ITA's successful implementation of its programs, policies, and services, and "drastically reduce [ITA's] application support expenditures." AR Tab 3 at 13. Many of the applications MIL Corp was in the process of updating would "no longer be commercially supported beyond January 2020," AR Tab 27 at 278, which required strict adherence to "the delivery schedule of each application," with

2

deadlines between June 2019 and March 2021, "to avoid significant program delays that result in substantial duplication of cost, lost time and elevated risks," AR Tab 1 at 3.

## II.     The Agency's Market Research

On April 17, 2017, ITA began conducting market research for a new procurement in accordance with FAR Part 10 and the Commerce Acquisition Manual. AR Tab 13 at 211. According to the agency's market research report, which was finalized on October 29, 2018, the agency gathered information between April 2017 and September 2018. Its sources included "both formal and informal mechanisms commensurate with the complexity, dollar value and past experience acquiring this and similar items." Id. Specifically, as described on the last page of the report, ITA conducted research "via the internet, www.google.com and GSA Schedule IT 70," reviewed "[h]istorical acquisition information, including the current contract and similar contracts issued within the Department," and explored "[i]nformation from ITA experts with personal knowledge of the applications, content, processes and the time it took for MIL Corp to acclimate and understand the ITA environment." Id. at 212.

In addition, during this period, ITA's Chief Information Officer ("CIO") and the acquisition office held "[m]ultiple meetings . . . to assess the progress of the Applications Development program toward meeting the goals of the IT modernization effort that began in 2014." Id. at 211. At the last planning meeting on August 14, 2018, ITA and the acquisition office reviewed what the agency characterized as "reasonable evidence" that the applications development program "would not be completed by the end of the current contract on March 31, 2019." Id. They discussed "various acquisition strategies . . . that could result in various levels of risk, costs and schedule impacts." Id.

On October 16, 2018, according to the market research report, the agency's CIO "provided a draft justification for a sole source, follow-on procurement," which contained "a brief overview of Legacy Applications required to be migrated and the development/migration of the ITA's High Priority Portfolio." Id. at 212. Although the "Legacy Applications [had been] moved to the AWS Cloud environment . . . , this move did not address outdated functionality, capabilities that no longer met business needs, poor integration with other critical systems, and increases in security management costs." Id. Consistent with its strategic plan, "ITA's management team [] laid out an aggressive but necessary path for technology modernization in order for ITA programs to scale effectively and address priorities in a timely and cost-effective manner." Id. at 211–12.

According to the report, the agency's research had "revealed the potential for many companies [that were] capable of performing applications development in its general sense." Id. But it did "not identif[y] any company other than MIL Corporation [that] possess[ed] the requisite institutional knowledge of all 30+ legacy applications, many [of] which [had] been highly customized specifically for the ITA's mission" and that could "reasonably be inserted into a multi-application, multi-year development effort and maintain the performance schedule of deliverables occurring between June 2019 and March 2021." Id. The "onboarding of a new contractor," the agency explained, would "result[] in learning curves and slow starts until the Contractor became knowledgeable with the organization and environment in which the application was to be provided." Id. MIL Corp's "institutional knowledge" from "their onsite

work on the modernization effort beginning in 2014," the agency opined, "makes them uniquely qualified" and "no other company could have obtained this knowledge about the systems developed to date, those in development and those to be developed in order to complete the final migration and transformation." Id.

The report concluded that "[w]ithout [MIL Corp's] institutional knowledge and ability to take over the current set of in-progress projects seamlessly, milestone deliverables scheduled for June and July 2019 cannot be met," which in turn would push back "the remainder of the applications development process resulting in substantial schedule delays." Id. "The delay in schedule," according to the report, "would in part be translatable to time spent for relearning/rework to reach a commensurate level of understanding which results in a duplication of costs and inefficiencies." Id.

## III.    Notice of Intent to Issue Sole Source Contract

On February 1, 2019, ITA published a notice to the FedBizOpps website of its "intent to issue a sole source contract to MIL Corporation for the procurement of Application Development services leading to the delivery of fully modified applications specific to [ITA's] Information Technology environment." AR Tab 3 at 8. The notice stated this was a "'follow-on' contract under the authority of FAR 6-302-1(a)(2)(ii) . . . for the continued development or production of a major system or highly specialized equipment." Id. at 8.[1] It provided that "[a]ny interested parties that desire to provide comments or capabilities . . . are invited to do so." AR Tab 9 at 101; see also AR Tab 3 at 9; Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 3, ECF No. 25.

## IV.    Correspondence Between the Parties in February and March of 2019

On February 2, 2019, Harmonia's Chief Operating Officer emailed the agency in response to the February 1 notice. This initiated an extensive exchange between ITA's contracting officer ("CO") and Harmonia regarding Harmonia's objections to ITA's notice of intent to issue a sole source contract to MIL Corp. AR Tab 14 at 221–22.

In its first email, Harmonia "respectfully object[ed] to the sole source action" and advised the agency that it could "expect to see a protest with either the [GAO] or the Court of Claims." Id. at 221. It wrote that "[t]here is NO justification for MIL Corp being the ONLY company capable of performing the contemplated work," asserting that "Harmonia is fully capable of performing the work, more cost-effectively and with higher quality than MIL Corp." Id.

---

[1] FAR 6.302–1(a)(2)(ii) grants an exception to "full and open competition" for government procurements in circumstances where "the supplies or services required by the agency are available from only one responsible source," including for "a follow-on contract for the continued development or production of a major system or highly specialized equipment, including major components thereof, when it is likely that award to any other source would result in[:] (A) Substantial duplication of cost . . . ; or (B) Unacceptable delays."

The agency responded to Harmonia that the "intent to sole source does not contemplate that no other company can provide Applications Development work." Id. at 220. Rather, the agency explained, it was proposing to award MIL Corp a "follow-on contract for the continued development or production of a major system or highly specialized equipment" as contemplated by FAR 6.302-1(a)(2)(ii). Id. at 220. The agency observed that MIL Corp had the "years of institutional and intellectual knowledge" necessary to achieve project "completion," and that "maintaining continuity through completion will result in meeting required milestone dates without experiencing a learning curve for a new contractor to get up to speed." Id.

Notwithstanding these considerations, the agency explained, its purpose in issuing the notice was to "validate" its understanding. Id. It therefore invited Harmonia to "provide information for which the Government may assess [Harmonia's] or another company's capabilities to win a follow-on contract that performs without duplication of costs or delays in schedule." Id. The agency advised Harmonia that:

> Given the nature of the work in progress and the premise of sole sourcing, it would be imperative for Harmonia to address the current state of the apps development, timeline to completion, milestone schedule and overall completion schedule along with a ROM of costs. These are the salient characteristics necessary to invalidate the conclusion supported by the regulation, which would then open the action for competitive processes. The inability to address such characteristics, or address them accurately, would support the conclusion that there would need to be a ramp up period and learning curve which is contrary to the purpose of the action as stated in the notice.

Id.

Harmonia responded later that day by email. Among other things, it stated that "if MIL Corp is doing [its] job well, then presumably all the work [it is] doing is well documented, which would enable another company to take over the work expeditiously," and "most importantly . . . most of the incumbent resources switch over to the new contractor" resulting in "little to no loss of knowledge or momentum, and no duplication of costs." Id. at 218–19. The agency replied, characterizing Harmonia's plan to "capture . . . incumbent employees" as "speculative." Id. at 218. It observed that Harmonia's points would be well-taken if the contract were one for operations and maintenance after the development effort were completed. Id. It also noted that providing documentation would not "mitigate the loss of continuity from not having the firsthand knowledge of progress to date" which might result in "duplication of costs and delays in schedule." Id.

The agency advised Harmonia that, in its view, "trading emails [was] not productive." Id. It informed Harmonia that if it believed that it could "drop in on this requirement, pick up the pace without skipping a beat, deliver on time to standard, and do[] so without capturing one incumbent staff for which [Harmonia has] no idea [whether it] will ever be able to do," then Harmonia should "articulate that capability" in its formal statement. Id.

On February 13, 2019, Harmonia submitted a letter to the agency in which, among other things, it objected to ITA's reliance on FAR 6.302-1(a)(2)(ii) as the authority to make a sole-

source award to MIL Corp. Id. at 223; AR Tab 15 at 226. That regulation, Harmonia noted, was inapplicable because it addresses "major system[s] or . . . highly specialized equipment" and "the procurement of supplies and not services." AR Tab 15 at 226. In addition, Harmonia complained that the notice of intent did not offer sufficient facts about the procurement to allow Harmonia "to [s]ubmit a [b]id." Id. at 227.

The agency apparently agreed that FAR 6.302-1(a)(2)(ii) was inapplicable, because on March 6 it amended its notice of intent to sole source to reflect a new regulatory justification for the sole-source award, namely FAR 8.405-6(a)(1)(C). AR Tab 9 at 101 (modification stating that the agency intended to award a contract to MIL Corp on a "limited source basis pursuant to FAR 8.405-6(a)(1)(C) [for a] logical follow-on contract in the interest of economy and efficiency"); see also AR Tab 3 at 11 (award decision stating that the February 1 notice "listed the incorrect authority" and that FAR 8.405-6(a)(1)(C) was "the more appropriate authority").[2]

In addition, and in response to Harmonia's request for additional facts, on March 15, the agency provided Harmonia a draft copy of the Limited Sources Justification ("LSJ") it intended to issue. AR Tab 16 at 232. The agency also again invited Harmonia to submit a capabilities statement, this time asking that it be provided by March 21. That same day, Harmonia emailed the agency to state that it was "hesitant to submit anything unless it's in response to a formal RFI." Id. at 231. Nonetheless, Harmonia requested more time to submit its capabilities statement, and the agency granted it until March 25, 2019 to do so. Id. Harmonia advised that it would let the agency know by the following Tuesday whether it intended to submit a statement and "apologiz[ing] in advance for the directness," it queried whether "any submission [would] truly get an honest shake," or if, instead, it was "just an exercise in justification." Id. The record contains no response from the agency regarding this last (presumably) rhetorical question.

On March 22, Harmonia emailed the agency to report that it had "gather[ed] additional information" that showed that "more than half of the Mil Corp team" were "either 1099s or C2C subcontractors" which it advised supported its view that these "incumbent resources could easily move to a new contract." AR Tab 17 at 235. Apparently at the agency's request, MIL Corp then supplied it with a staffing list that showed that Harmonia's "additional information" was inaccurate. Id. at 233; AR Tab 18 at 240–42; AR Tab 19 at 243. The list revealed that the majority of MIL Corp personnel under the predecessor contract (sixty-six out of seventy-six full time employees) were MIL Corp employees, not subcontractors. AR Tab 18 at 240–42.

## V.    Submission and Evaluation of Harmonia's Capabilities Statement

On March 25, Harmonia submitted a capabilities statement to the agency, which addressed its overall capabilities as well as capabilities specific to the follow-on task order. AR Tab 21 at 254, 258. Harmonia stated that it had a "strong track record in managing complex

---

[2] FAR 8.405-6(a)(1)(i)(C) provides that an agency may "justify[] limiting the source" when "[i]n the interest of economy and efficiency, the new work is a logical follow-on to an original Federal Supply Schedule order" so long as "the original order was placed in accordance with the applicable Federal Supply Schedule ordering procedures[, and t]he original order or BPA must not have been previously issued under sole-source or limited-sources procedures."

portfolios of applications for modernization" as well as an "ability to deliver mission critical systems[] that me[et] tight Federal agency timelines" Id. at 259–60. In section 1.1.2 of the statement, titled "Ability to Transition-In and Complete Work from an Incumbent Contractor," Harmonia asserted that it had "developed a mature transitioning-in process[] that enabled [it] to commence work that is highly domain specific and requires significant knowledge transfer in a short time period (as short as two weeks) for systems modernization and application development." Id. at 260. It noted its belief that "incumbent capture [was] desirable but not critical," and that it "seek[s] to create a balance between incumbent knowledge and fresh perspectives." Id. at 260–61. Harmonia cited a previous federal contract which it claimed provided an example of a "transition . . . without incumbents" and another which it claimed showed that its "processes" allowed it to perform "knowledge capture." Id. at 261. Harmonia further outlined its "capabilities to perform work with strong similarities to the applications cited in the LSJ document." Id. at 261–65.

On March 26, the day after Harmonia submitted its statement, ITA's CIO provided the CO with his views. He acknowledged that Harmonia had "some outstanding capabilities and previous work deliveries that are quite impressive," and that it was "well equipped to service our major strategic platforms in future efforts." AR Tab 23 at 267. He also "highly recommend[ed] that [Harmonia] participate in [the agency's] next set of requests for information [or] . . . proposals." Id. However, the CIO observed, "[t]he projects that are the most urgent for ITA are, unfortunately, based on older technologies and encompass extremely complex and heavily customized applications that are totally unique to ITA." Those projects, he noted, "are the targets of [an] extremely aggressive migration process," are "an integral part of our Strategic Plan," and "reflect[] our need to drastically reduce our application support expenditures." Id. He explained that MIL Corp possessed "extensive and detailed knowledge about this complex set of applications and [is] uniquely positioned to deliver our planned migration in the time frames that have been established as targets for completion," and that he continued to believe that "the risk to the government of losing said expertise is so substantial as to justify the need for our current acquisition strategy." Id.

## VI.    The Limited Sources Justification and Award Decision

The agency finalized the LSJ on March 27, 2019. AR Tab 1 at 6. Among other justifications for a sole-source award, the LSJ described ITA's "unique challenges establishing private, secure communications and enterprise applications while maintaining absolute mobility," explained ITA's application development project, outlined the application delivery schedule required to meet ITA's strategic plan, and listed the "30+ specific applications in development" with their required delivery dates (between 2019 and 2021). Id. at 1–6. The LSJ concluded that the sole source award "represents the best value" because MIL Corp's "institutional knowledge and intellectual capital gained through performance of the original contract cannot be transferred to a new contractor without a substantial duplication of time resulting in a duplication of costs, missed milestone deliveries and delays in obtaining efficiencies and effectiveness for the ITA's globally dispersed workforce." Id. at 4. The agency provided examples of the work in progress, including SharePoint Migration, Tasking and Tracking, Business-to-Business Matchmaking, Salesforce Lightning Migration, Antidumping and Countervailing Duties, Case Management Modernization, and Section 232 Investigations Case Management. Id. at 3–4.

In the award decision memorandum dated March 29, 2019, the CO documented the reasons he decided it was "reasonable and prudent" and in the interest of "economy and efficiency" to issue a "logical follow-on" sole-source contract under FAR 8.405-6(a)(1)(i)(C) to MIL Corp. AR Tab 3 at 15–16. The award decision summarized the agency's requirements, its communications with Harmonia regarding the procurement, and its rationale for issuing the contract under the regulation. Id. at 7–16. The CO concluded that onboarding a new contractor "in mid-development" presented a "high risk for performance failures and cost overruns" unless the contractor had "significant incumbent capture." Id. at 15. If a non-incumbent were awarded the contract, the CO predicted, "significant time will need to be devoted to bringing the knowledge base up to the current level of MIL Corp which is necessary for successful and timely completion" and that this would lead to "a corresponding slip in delivery schedule that makes meeting the 2021 fully modernized IT environment unattainable." Id.

The CO noted that, in making its determination to award the follow-on contract to MIL Corp, the agency had considered all information Harmonia had submitted. Id. at 14. Concurring with the concerns expressed by the CIO, he noted that although "Harmonia provides several examples of where [it has] been successful [transitioning into an application development contract] in other agencies[, it] does not elaborate on what [its] mature [transitioning-in] process is so that assessment can be made for applicability to the ITA portfolio of applications under development." AR Tab 3 at 13. Harmonia's statement, he reasoned, did "not provide any context or relevance to the nature of the ITA requirement." Id. Many of the examples Harmonia cited, he observed, "appear to provide support of ongoing systems and platforms" which demonstrate "transitional capabilities in taking over the [operations and maintenance] requirements for . . . existing systems, not demonstrating success in taking over a developmental activity that is in-progress." Id. Further, the CO found, "Harmonia's capabilities statement does not address [its] familiarity or expertise with the majority of the legacy applications, some of which are highly customized for the ITA mission[, and were] listed in the LSJ[,] or [its] ability to meet the required delivery timeline." Id. at 13–14.

The CO concluded that, in the end, Harmonia's position "appears [to require it] to capture incumbent staff who . . . have institutional knowledge of the ITA environment and applications to perform successfully and on time." Id. at 14. He observed that Harmonia had "clearly articulated" its belief that doing so would be "normal and easy" but that his assessment was "that incumbent capture cannot be guaranteed and that Harmonia's emphasis on capturing incumbents, supports and validates [the] Agency's position that the already gained institutional knowledge is valuable and necessary." Id. "Reliance on the capture of incumbent employees," he reasoned, "is a risk that is not merited because they are currently available from the incumbent contractor." Id.

On April 1, ITA issued order number 1331L5-19-F-1350-0279 to MIL Corp under their FSS IT 70 Schedule GS-35F-443GA, AR Tab 10 at 103–04, "for the continuance of Applications Development work that [is] urgent for ITA." AR Tab 3 at 16. On April 2, the CO issued two public notices via FedBizOpps, including an award/justification notice, the final LSJ, and an amended notice under 1331L5-19-S-1350-0001 that an award had been made. AR Tabs 24–26.

## VII.  Harmonia's GAO Protest

On April 9, 2019, Harmonia protested ITA's award decision to MIL Corp to the GAO. AR Tab 5 at 17. GAO rejected Harmonia's protest on July 16, concluding that ITA's "decision to issue the award to the incumbent was reasonable and in the interest of economy and efficiency." AR Tab 33 at 298, 309. It explained that "[t]he agency's position . . . that changing contractors in the middle of an extremely complex project with impending critical and mandatory programmatic deadlines poses unnecessary risk to both project schedule and cost" is "simple and well-documented in the record." Id. at 309. GAO found "no merit" to Harmonia's claim that "the agency failed to adequately verify and quantify its conclusions regarding the benefits of avoiding transition by issuing the order to the incumbent." Id. at 310. It also was not persuaded by Harmonia's allegation that "the agency was biased in favor of The MIL Corporation [and so] 'structured' its market research from the outset to support an award to the incumbent" by emphasizing the need for the contractor to have "institutional knowledge of the 30+ legacy applications in development." Id. at 311. GAO found that the agency's approach, rather than "demonstrating any bias on the part of the agency . . . [,] represents a logical consideration in an ongoing application development project involving applications that have been significantly customized for the agency." Id.

Finally, GAO rejected Harmonia's contention that the "agency's concerns regarding schedule delays are overblown because Harmonia intends to hire as much of the incumbent workforce as possible." Id. It observed that because the record demonstrated that most of the MIL Corp workforce were employees, not contractors, "incumbent capture is not guaranteed." Id. at 311–12. GAO concluded that it had "no basis to question the reasonableness of the agency's" award to MIL Corp given "the unique nature of the agency's applications development effort, the impending deadline for completion of the effort, [and] the similarity and interrelationship" of the 2014 and 2019 contracts. Id. at 312.

## VIII.  This Action

On July 23, 2019, a week after its protest was denied at GAO, Harmonia filed a complaint in this court. ECF No. 1. The next day, Harmonia moved for a preliminary injunction. ECF No. 9. The Court granted MIL Corp's motion to intervene on July 25. ECF No. 14. The government filed the administrative record on August 7. ECF No. 24. Harmonia filed its motion for judgment on the administrative record on August 21, ECF No. 25, and the government and intervenor filed their separate cross-motions on September 4, ECF Nos. 26–27. Oral argument was held on October 22. ECF No. 33.

## DISCUSSION

## I.  Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any

alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

For standing to bring a bid protest under § 1491(b)(1), a plaintiff must be an "interested party," i.e., "an actual or prospective bidder" who possesses a "direct economic interest" in the procurement. CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). A protestor to a sole-source contract has a direct economic interest if it contends that "it could compete for the contract if the bid process were made competitive." CliniComp, 904 F.3d at 1358 (quoting Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that to establish standing, a plaintiff must allege "prejudice," which can be demonstrated "as part of . . . showing a direct economic interest").

Harmonia is an interested party and thus has standing to bring this protest. As it timely submitted its capabilities statement, it qualifies as a prospective bidder for purposes of a sole-source challenge. See Digitalis, 904 F.3d at 1385. In addition, Harmonia had a direct economic interest in this procurement because it was qualified to perform the requirements of the contract and thus could have competed for it. See Myers, 275 F.3d at 1370–71. Therefore, Harmonia has standing to challenge this sole-source procurement.

## II.     Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Under RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.    Scope of Review of Procurement Decision

The Court reviews challenges to procurement decisions under the standard used to evaluate agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the

agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

"The arbitrary and capricious standard is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that under the APA a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (noting that court's function in bid protest is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion'") (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).

Therefore, when viewing an agency procurement decision, the Court cannot substitute its judgment for that of the agency. See Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion"). Further, the protester "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa, 238 F.3d at 1338. For the agency to prevail, it need only articulate "a rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quotations omitted).

## IV.   Merits

In accordance with FAR 8.405–6, orders placed under Federal Supply Schedules are exempt from the competition requirements of FAR Part 6. The provision nonetheless sets forth criteria that an agency must satisfy to justify a decision to make a non-competitive award. The agency here relied upon FAR 8.405–6(a)(1)(i)(C), which allows an agency to limit the sources it considers where "the new work is a logical follow-on to an original Federal Supply Schedule order" and doing so is "[i]n the interest of economy and efficiency," so long as "the original order was placed in accordance with the applicable Federal Supply Schedule ordering procedures" and not "previously issued under sole-source or limited-sources procedures."

Harmonia does not deny that the new work to be performed is a logical follow-on to the original task order issued to MIL Corp. Indeed, the record reflects that the new work is a continuation of the IT modernization project that was the subject of the original task order but which was not completed within the order's five-year term. Harmonia also does not dispute that the original task order was competitively awarded to MIL Corp in accordance with the applicable Federal Supply Schedule ordering procedures. Instead, it challenges the agency's determination that awarding the follow-on work to MIL Corp on a sole-source basis was "in the interest of economy and efficiency." In particular, Harmonia challenges the process that the agency used to determine whether the interest of economy and efficiency standard was satisfied. It also states that the agency "irrationally ignored" Harmonia's capabilities statement.

For the reasons set forth below, Harmonia's protest lacks merit. The agency's determination that the follow-on award to MIL Corp served the interests of economy and efficiency was a reasonable one. Further, Harmonia's claims that: 1) the agency's decision-making process was flawed and/or biased in favor of MIL Corp, and 2) that the agency ignored its capabilities statement are not supported by the administrative record.

## A.   The Agency's Justification for Awarding a Logical Follow-On Contract

The Court's research has not identified any decisions by the Court of Federal Claims or the Federal Circuit that interpret the "interest of economy and efficiency" standard set forth in FAR 8.405–6(a)(1)(i)(C). It seems self-evident, however, that a standard based on what serves an agency's interests in "economy" and "efficiency" is one that affords agencies broad discretion. The Court concludes therefore that FAR 8.405–6(a)(1)(i)(C) permits agencies to award follow-on contracts on a sole-source basis where the agency determines, based on its own expertise and experience, that doing otherwise would risk increased costs, delays, or other disruptions to the accomplishment of the agency's mission. See Harmonia Holdings Grp., LLC, B-417465, 2019 WL 3284613, at *10 (Comp. Gen. July 16, 2019) (observing that GAO has "consistently stated that an agency's limited sources justification is reasonably made in the interest of economy and efficiency where it is based upon documented concerns regarding disruption of service, duplication of efforts, transition delays, and/or increased costs."); Noble Supply & Logistics, B-417269, 2019 WL 2022680, at *7 (Comp. Gen. Apr. 30, 2019) (denying a protest where the record supported the agency's determination that award of a logical follow-on would avoid duplication of material costs and efforts); Fed. Working Grp., B-416464, 2018 WL 4610826, at *2 (Comp. Gen. Sept. 19, 2018) (upholding an agency award of a logical follow-on contract where transition to a non-incumbent in an ongoing project would duplicate and increase costs, create transition delays, and lead to missed deadlines); Xtec, Inc., B-405505, 2011 WL 5517382, at *6 (Comp. Gen. Nov. 8, 2011) (noting that the protestor's "assertions that it could provide a seamless transition . . . is not sufficient to find [the agency's] justification, which is in substance based on concerns about economy and efficiency, unreasonable").[3]

In this case, the agency concluded that it was in the "interest of economy and efficiency" that MIL Corp be awarded a "logical follow-on" contract to finish the IT modernization project. FAR 8.405–6(a)(1)(i)(C). As explained in detail above, it did so in light of the tight schedule that the agency had established to update soon-to-be obsolete applications, and because it was critically important to the agency that it remain on schedule to fulfill ITA's mission and strategic plan. The agency determined that MIL Corp's "institutional knowledge and intellectual capital gained through performance of the original contract cannot be transferred to a new contractor without a substantial duplication of time resulting in a duplication of costs, missed milestone deliveries and delays in obtaining efficiencies and effectiveness for the ITA's globally dispersed workforce." AR Tab 1 at 4. It further concluded that, unless the award were made to MIL Corp, "significant time will need to be devoted to bringing the knowledge base up to the current level of MIL Corp which is necessary for successful and timely completion" resulting in "a

---

[3] GAO decisions are not binding on the Court but may be treated as persuasive authority in light of GAO's expertise in the bid protest arena. See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011).

corresponding slip in delivery schedule that makes meeting the 2021 fully modernized IT environment unattainable." AR Tab 3 at 15.

These determinations were based on the expertise of agency IT staff (including its CIO), as well as market research, as described below. The Court agrees with GAO that the agency's decision reflects a reasonable exercise of its broad discretion under FAR 8.405–6(a)(1)(i)(C) to award a follow-on contract on a sole-source basis in the interests of economy and efficiency. It turns, therefore, to Harmonia's challenges to the process by which that decision was made, including the adequacy of the agency's market research.

### B.    Harmonia's Arguments

As noted, Harmonia's protest focuses on what it contends were flaws in the process that the agency employed to determine whether it was in the interest of economy and efficiency to award a follow-on contract to MIL Corp on a non-competitive basis. For the reasons set forth below, plaintiff's contentions lack merit.

### 1.  The Agency's Market Research

Under the FAR, agencies are required to conduct market research for the purpose of finding "the most suitable approach to acquiring, distributing, and supporting supplies and services." FAR 10.000. The market research an agency conducts must be "appropriate to the circumstances," FAR 10.001(a)(2), and its extent "will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience," FAR 10.002(b)(1). Therefore,

an agency is afforded "substantial discretion in the scope and manner of conducting market research." Raymond Express Int'l, LLC v. United States, 120 Fed. Cl. 413, 431 (2015); see also Am. Relocation Connections, L.L.C. v. United States, 139 Fed. Cl. 747, 783–84 (2018), aff'd, No. 2019-1245, 2019 WL 5092892 (Fed. Cir. Oct. 11, 2019).

In this case, the market research report the agency finalized in October of 2018 explains that its market research efforts included performing searches of the internet and GSA Schedule IT 70 to identify companies that performed applications development work. AR Tab 13 at 212. In addition, the agency reviewed "[h]istorical acquisition information, including the current contract and similar contracts." Id. Further, the agency conferred with its own experts who had "personal knowledge of the applications, content, processes and the time it took for MIL Corp to acclimate and understand the ITA environment." Id.

The record also reveals that after the agency tentatively decided to sole source the contract to MIL Corp in October of 2018, it took the extra step of issuing a notice of its intent to do so, even though such advanced notice was not required by the applicable FAR provision. See FAR 8.405–6(a)(2)(i) (specifying that an agency must post notice of an order supported by a limited-sources justification "[w]ithin 14 days after placing an order"). In that notice, the agency solicited comments and capabilities statements from interested parties. AR Tab 9 at 101. It then engaged with a rather hostile Harmonia by email, explaining the reasons why it was not inclined to consider other contractors, but nonetheless supplying Harmonia with additional information and inviting it to submit a capabilities statement, which Harmonia ultimately did. See AR Tab 3

at 9–14 (recounting in the agency's award decision its consideration of the communications with Harmonia).

Despite these agency efforts, Harmonia characterizes the agency's information gathering as essentially a sham. Specifically, it claims that the agency "made the decision to make a sole-source award to [MIL] Corp. before performing market research," Pl.'s MJAR at 8, and that the research the agency conducted "assumed its conclusion," i.e., was structured to inevitably result in an award to MIL Corp. Id. at 10.

The Court notes that in its reply brief, Harmonia resists the notion that the gravamen of these arguments is that the agency did not act in good faith when it decided to award MIL Corp a follow-on contract. See Pl.'s Reply in Support of its Mot. for J. on the Admin. R. at 11–12, ECF No. 30. In the Court's view, however, Harmonia's claims that the agency conducted market research only so that it could provide an after-the-fact justification for a decision it already made clearly sound in bad faith. See, e.g., Pl.'s MJAR at 2, 7 (claiming that the agency merely "purported to conduct[] market research," and that it "tailored its research to come to a predetermined answer"); id. at 9 (citing Dep't of Commerce v. New York, 139 S. Ct. 2551, 2575–76 (2019) for the proposition that "when the government justifies its decisions with information acquired after making the decision, that justification is pretext"). But it is well established that government officials enjoy the presumption that their actions are taken in good faith. See Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993). To overcome this presumption, Harmonia must provide clear and convincing evidence to the contrary. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239–40. Harmonia, however, does not attempt to meet this burden and, at oral argument, its counsel effectively acknowledged that it could not do so. See Oct. 22, 2019 Hr'g at 2:12:10–13:40.

In any event, even if Harmonia's argument did not allege bad faith, it would fail because the record refutes its claim that the agency conducted its research only after deciding to issue a sole-source award to MIL Corp. It also refutes Harmonia's contention that the agency structured its research to benefit MIL Corp.

To begin with, the draft justification for limiting sources that the agency prepared in October 2018 was by definition a preliminary—not final—product. Creating a draft is one step in a typical decision-making process rather than its logical conclusion. Thus, even if Harmonia were correct that the agency had performed the market research described in the report only after preparing a draft justification, that would not provide evidence that the process that led to the final decision to award a follow-on contract to MIL Corp was, as Harmonia alleges, an irrational one.

Further, Harmonia's claim that the agency did not perform any market research before it prepared its draft justification is based largely on the placement of the narrative concerning the agency's research methods at the end of the market research report. Thus, Harmonia asserts, "[a]lthough the Agency's market research report says that the 'ongoing market research for this procurement began on . . . April 17, 2017,' nothing in the report hints that the Agency did anything beyond holding meetings and developing requirements before October 16, 2018." Pl.'s MJAR at 9.

14

Harmonia ignores, however, that the introductory paragraph to the relevant section of the market research report (entitled "Market Research Process") expressly states that the agency conducted market research over a lengthy time period before the draft LSJ was prepared in October 2018. It states that: 1) "[t]he ongoing market research effort for this procurement began on . . . April 17, 2017," and 2) the agency gathered information "between 2017 and September 2018" using "both formal and informal mechanisms commensurate with the complexity, dollar value and past experience acquiring this and similar items." AR Tab 13 at 211. The introductory paragraph further asserts that during this period, "conclusions were reached, and additional market research sources and activities were conducted as necessary." Id.

The "Market Research Process" section goes on to provide a chronological history of the meetings that were held to assess the progress of the applications development program toward meeting the goals of ITA's strategic plan. Id. The report reflects that the upshot of these meetings was a conclusion that the IT modernization project would not be completed by the expiration of the initial contract on March 31, 2019. The participants therefore discussed "various acquisition strategies . . . that could result in various levels of risks, costs and schedule impacts." Id. This effort culminated with the CIO creating a draft justification for a sole-source, follow-on procurement on October 16, 2018. Id. at 212.

Harmonia fixates on the fact that the two-paragraph passage that describes the specific modes of market research the agency employed appears in the report after the discussion of the chronology of the market research process. Id. But that fact has no bearing on when the market research itself was performed, and it certainly does not provide a basis for questioning the report's express representation that the agency conducted market research over a period that began in 2017 and continued through September 2018.

The Court also finds without merit Harmonia's related contention that the agency's market research was irrational or biased in favor of MIL Corp because it sought to identify contractors that possessed qualifications that only MIL Corp could be expected to possess, i.e. knowledge of all of the more than thirty legacy applications involved in the modernization project, many of which had been customized for the agency. The Court agrees with GAO that "[f]ar from demonstrating any bias on the part of the agency, such a desire represents a logical consideration in an ongoing application development project involving applications that have been significantly customized for the agency." AR Tab 33 at 311. Critically, the record shows that the agency did not base its decision to award a follow-on contract to MIL Corp solely on the fact that no other contractors had MIL Corp's institutional knowledge and experience. Instead, the agency went further to consider whether other contractors might step in and perform the follow-on contract without undue risks of delay and increased costs. It concluded, however, that they could not and, for the reasons set forth above, that conclusion was a reasonable one.

## 2.  Harmonia's Capabilities Statement

Harmonia's final claim is that "[t]he agency irrationally ignored [its] capabilities statement." Pl.'s MJAR at 11. This contention is flatly contradicted by the record, which shows that the agency conducted itself in a transparent manner in its communications with Harmonia, and that it carefully considered Harmonia's capabilities statement, even if it ultimately found it unpersuasive.

First, the record shows that the agency provided Harmonia with advanced guidance regarding what it would take to persuade the agency that it was not in the interest of economy and efficiency to award a follow-on contract to MIL Corp. It advised Harmonia that "[g]iven the nature of the work in progress and the premise of sole sourcing, it would be imperative for Harmonia to address the current state of the apps development, timeline to completion, milestone schedule and overall completion schedule along with a ROM of costs." AR Tab 14 at 220.

Further, the record reflects careful consideration of Harmonia's capabilities statement by both the CIO and the CO. The CIO, for his part, acknowledged that Harmonia had "some outstanding capabilities and previous work deliveries that are quite impressive." AR Tab 23 at 267. Nonetheless, its capabilities statement did not alleviate his concern about the risks in terms of costs and efficiencies of transitioning to a new contractor in the middle of the applications development project. Id. As described in greater detail above, the CIO explained that the agency's most urgent projects were "based on older technologies and encompass extremely complex and heavily customized applications that are totally unique to ITA" and that the projects were "the targets of [an] extremely aggressive migration process," that were "an integral part" of the agency's strategic plan. Id. The agency, he noted, had a "need to drastically reduce [its] application support expenditures." Id. He reiterated that the incumbent, MIL Corp, was "uniquely positioned" to meet established time frames, concluding that "the risk to the government of losing [MIL Corp's] expertise is so substantial as to justify the need" to award it a follow-on contract. Id.

The CO agreed and provided additional explanation of his views in the award decision. In particular, the CO was not persuaded by Harmonia's statements that "incumbent capture [was] desirable but not critical" and that its "mature transitioning-in process[]" enabled it to "commence work . . . [and transfer] knowledge . . . in a short time period (as short as 2 weeks) for systems modernization and application development." AR Tab 21 at 260. The CO noted that although "Harmonia states in [its] capabilities statement that incumbent personnel are not critical to performance of schedule, [it does] not offer any relevant information that would reasonably support this conclusion and some of their communications indicate otherwise." AR Tab 3 at 15. Indeed, in discussions with the agency before it submitted its capabilities statement, Harmonia had featured incumbent capture as a critical element of its own proposal that would allow it to step in to complete the ongoing modernization project without delay or disruption. See, e.g., AR Tab 14 at 218–19.

Further, the CO concluded that Harmonia failed to provide adequate detail regarding how it would achieve a quick and seamless transition for this specific procurement. The CO observed that the examples Harmonia provided in its capabilities statement "appear to provide support of ongoing systems and platforms" that demonstrate "transitional capabilities in taking over the [operations and maintenance] requirements for . . . existing systems, not demonstrating success in taking over a developmental activity that is in-progress." AR Tab 3 at 13.

In short, the agency did not ignore Harmonia's capabilities statement. To the contrary, it provided Harmonia with advanced guidance regarding what the statement should contain and then thoughtfully and thoroughly evaluated the information Harmonia provided. The agency's assessment of the risks of switching contractors midstream was based on the application of its technical expertise and understanding of the ongoing modernization project. Its determination,

which is entitled to significant deference, was a reasonable one. The Court therefore rejects Harmonia's claims based on the agency's evaluation of its capabilities statement.

## CONCLUSION

Based on the foregoing, Harmonia's motion for judgment on the administrative record, ECF No. 25, is **DENIED**. The government and intervenor's cross-motions for judgment on the administrative record, ECF Nos. 27–26, are **GRANTED**. Harmonia's motion for preliminary injunction, ECF No. 9, is **DENIED** as moot. The Clerk is directed to enter judgment accordingly. Each side will bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge